UNITED STATES of America, Plaintiff,

v.

Rick Dean STICKLE, Michael D. Reeve, John Karayannides, Michael M. Krider, George K. McKay, and Philip J. Hitchens, Defendants.

No. 04–20072–CR.

United States District Court, S.D. Florida.

Oct. 6, 2004.

Gregory F. Linsin, Special Litigation Counsel, Environmental Crimes Section, Washington, DC, Ausa Thomas Watts–Fitzgerald, Miami, for Plaintiffs.

Robert Tarun, Chicago, IL, for Rick Dean Stickle.

Hy Shapiro, Miami, FL, for Michael D. Reeve, David Gerger, David Markus, Local counsel, Houston, TX, for Michael M. Krider.

John Sweeney, Dallas, TX, for George K. McKay.

Charles White, Miami, FL, for Philip J. Hitchens.

### OMNIBUS ORDER ON PENDING MOTIONS

GOLD, District Judge.

## I. BACKGROUND

The Government has filed a three-count indictment against Defendants Stickle, Reeve, Karayannides, Krider, McKay and Hitchens [D.E. # 1]. Defendants Krider, McKay and Hitchens have entered guilty pleas. Defendant Karayannides is a fugitive. Defendants Stickle and Reeve are specially set for trial on October 25, 2004.

In Count One, all the defendants are charged with a conspiracy to knowingly discharge, or cause to discharge, approximately 442 metric tons of diesel-contaminated wheat and diesel fuel, into the sea, from a ship of more than 400 gross tons, without use of an oil discharge monitoring and control system, in violation of Title 33, United States Code, Section 1980(a); Title 33, Code of Federal Regulations, Section 151.10(a); MARPOL, Annex I, Regulation 9, and Title 18, United States Code, Section 2. Count Two charges all defendants with the substantive crime alleged in Count One, and Count Three charges Defendant Krider with procuring, by false pretenses, the execution and delivery of an instrument of writing, the value of which did not exceed $1,000.00, in violation of Title 18, United States Code, Section 1025.

Defendants Stickle and Reeve have filed a number of joint motions relative to the Indictment. These motions are: (1) motion to transfer case to Northern District of Iowa [D.E. # 28]; (2) motion to dismiss Counts One and Two of the Indictment under the Rule of Lenity on basis that 33 C.F.R. § 151.10(a) is unconstitutionally vague [D.E. # 46]; (3) motion to dismiss Count One of the Indictment for failure to state an offense and for being fatally duplicitous [D.E. # 48]; (4) motion to dismiss Count One of the Indictment for lack of venue [D.E. # 49], and (5) motion to dismiss Count Two of the Indictment for lack of venue [D.E. # 50]. In addition, they filed a motion for a limited Bill of Particulars on venue for Count One of the Indictment [D.E. # 51], and a motion for timely production of exculpatory material and for disclosure of impeachment information [D.E. 52].

Oral argument on all motions was held on July 16, 2004. By Order dated August 11, 2004 [D.E. # 86], I denied all of the substantive motions. I also granted in part and denied in part the motion for limited Bill of Particulars, and granted the motion for timely production of exculpatory material and disclosure of impeachment information.[1] I stated that, by separate order, I would set forth my reasons in writing for denying the substantive motions. I hereby enter this Order to accomplish that purpose.

## II. DEFENDANTS' JOINT MOTION TO TRANSFER [D.E. # 28]

The Defendants, Rick Dean Stickle and Michael D. Reeve, move, pursuant to Fed.R.Crim.P. 21(b), for an order transferring this case to the Northern District of Iowa. A motion for change of venue to another district made pursuant to Fed. R.Crim.P. 21(b) is based on an evaluation of "convenience of the parties and the wit-

---

1. On the Bill of Particulars, I ordered the Government to provide supplemental notice to the Defendants if it intends to rely on any additional facts and circumstances to establish venue for Count One in the Southern District of Florida. With regard to the motion to compel, I ordered the Government to provide all *Brady* material within its possession or under its direction and control by August 15, 2004. I also required the Government, in good faith, to supplement that material if it is later discovered.

nesses and in the interests of justice." In *Platt v. Minnesota Mining & Manufacturing Co.,* 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964), the United States Supreme Court summarized factors that are properly considered by a district court in evaluating a transfer motion, including: the location of the defendants; the location of possible witnesses; the location of events likely to be at issue; the location of documents; potential disruption of a defendant's business; expenses to the parties; location of counsel; relative accessibility of the place of trial; the docket condition of each district involved, and any other special factors which might affect transfer. The relative significance of these factors varies widely from case to case and "[t]he decision of whether to grant [a] motion to transfer under Rule 21 [lies] within the trial court's discretionary authority ...." *United States v. Kopituk,* 690 F.2d 1289, 1322–23 (11th Cir.1982) (citations omitted). The burden falls on the defendant to demonstrate a substantial imbalance of inconvenience to himself if he is to succeed in nullifying the prosecutor's choice of venue. *United States v. Sklaroff,* 323 F.Supp. 296, 323–24 (S.D.Fla.1971).

■ Applying these factors, I deny the motion because Defendants Stickle and Reeve have failed to sufficiently demonstrate a substantial imbalance of inconvenience. Having considered and balanced the *Platt* factors, I conclude that a trial in Miami will best serve the convenience of the parties and witnesses and the interest of justice.

The core of the Defendant's motion emphasizes the factors as to Count One (the conspiracy count) and virtually ignores an analysis of the pertinent factors as to Count Two (the substantive count) where all defendants are named as well. I, however, am not so limited in my analysis.[2]

Count Two charges that the Defendants, including Stickle and Reeve, "did knowingly discharge and cause to be discharged from a ship of more than 40 gross tons oil and oily mixture, that is, approximately 442 metric tons of diesel-contaminated wheat and diesel fuel, into the sea without the use of an oil discharge monitoring and control system," in violation of the Act to Prevent Pollution from Ships, 33 U.S.C. § 1908(a). Indictment, page 11. The Government charged in the Indictment that the discharge occurred while the *S.S. Juneau* was on the high seas. *See* Indictment, Overt Act 16, page 10. Thus, according to the Government, the core substantive offense occurred "... upon the high seas, or elsewhere out of the jurisdiction of any particular State or district ...." The Government argues, as is more fully set forth below, that venue might properly exist in the Southern District of Florida (residence of Defendant Hitchens), the Northern District of Iowa (residence of Defendants Stickle and Reeve), the Southern District of Texas (residence of Defendants McKay and Krider), and the District of Columbia (Defendant Karayannides being a current resident of Greece).

■ While it is correct that Defendants Stickle and Reeve reside in Iowa, and, in fact, may be the only defendants to proceed to trial at this point, "[A] criminal defendant has no right to be tried in the place of his domicile, ..., and the defendant's concerns about being tried away from home are ordinarily of little relevance to a motion for a change of venue." *United States v. Bagnell,* 679 F.2d 826, 832 (11th Cir.1982)("Bagnell also contends that the district court abused its discretion in denying his motion for a change of venue to the central district of California pursuant to Rule 21(b) of the Federal Rules of

**2.** Neither of the defendants who seek a

change of venue is charged in Count III.

Criminal Procedure. We disagree. A criminal defendant has no right to be tried in the place of his domicile, *United States v. Walker*, 559 F.2d at 372, and the defendant's concern about the expense and inconvenience of being tried away from home is ordinarily of little relevance to a motion for a change of venue. *United States v. Sanchez*, 508 F.2d 388, 393–95 (5th Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975)").

Of more significance, the core fact witnesses in this case, as to Counts One and Two, are the seamen who served as officers and crew members about the *S.S. Juneau* during the voyage in question. According to the Government, these witnesses reside in a range of coastal districts around the United States, and none are residents of the Northern District of Iowa. The Government also advises that it will need to call several fact witnesses from overseas, including Bangladesh, Singapore, and potentially, Bulgaria, and further claims that other necessary fact witnesses presently reside in Alaska, New York, Washington, D.C., and a number of other States around the country. It intends to call relatively few fact witnesses who are residents of Iowa. Based on this situation, I conclude that the more dispositive *Platt* factor in this case with respect to nonparty witnesses is the relative accessibility of the place of trial in Miami, Florida, as compared to Cedar Rapids, Iowa.

Although Cedar Rapids, Iowa, is the location of Sabine headquarters, the "location" for the relevant evidence of the claimed violations in Count Two is the vessel from which discharge of the diesel contaminated wheat occurred. In addition, while a number of the overt acts in Count One are alleged to have occurred, or originated, at Sabine headquarters, other overt acts are alleged to have occurred at other locations both in and out of the United States, or were carried out in such locations at the direction of the defendants from Sabine headquarters. In other words, this is a case where significant aspects of the conspiratorial agreement occurred in locations far removed from headquarters operations. Since the conspiracy and the substantive act alleged are widespread, this factor is at best neutral.

Regarding the potential documentary evidence, the Government claims that the volume of documents it intends to introduce, and has provided in discovery, is "quite modest." On the other hand, the defense claims that it will not have meaningful access to its records and resources because it is logistically impossible to move "years" worth of business records from Iowa to Florida. Defendants have not satisfactorily established why "years" of business records are needed by the defense, when the alleged conspiracy consists of a five-month duration and the second count alleges a single APPS violation that occurred over a seven-day period.[3] Here, I credit the Government's more modest estimate of the evidence at issue and do not find this to be a significant factor warranting transfer of venue.

While Defendants Stickle and Reeve raise generic claims relative to the potential disruption of their businesses, I do not conclude that this factor should be given significant weight. The trial is scheduled for a three to four week period, and, in fact, may be of shorter duration, especially given extensive pretrial requirements relative to documents.[4] During that time,

---

**3.** It is premature to consider what evidence, if any, would be admissible under Rule 404(b) of the Federal Rules of Evidence.

**4.** A pretrial conference was held on September 10, 1994 in order to reduce the trial time required.

Defendants Stickle and Reeve will likely experience a business disruption and inconvenience regardless of the venue of the trial. It is an inherent result in criminal prosecutions which impose burdens on named defendants. I do not find, however, that the claimed disruption is so onerous that it requires a transfer in the interest of justice. Trial will be from Monday through Thursday of each week, and will conclude each day at 4:30 p.m. Each defendant will have Fridays and Saturdays available to work on business related matters, which, in our modern world of e-mail and facsimile, can be accomplished throughout the United States, even during the evening hours after trial. I realize that doing so may be more difficult for Defendant Reeve who has left his employment with Sabine and is now working as a business and sales manager at an automobile dealership, but I conclude that the degree of difficulty continuing the businesses, or the financial effect of not being present in Iowa, has not been established to such an extent as to predominate in the required balancing of factors.

As to the expenses to the parties, the Defendants claim that the magnitude of the foreseeable costs of a trial in the Southern District of Florida weighs heavily in favor of a transfer of this case to Iowa. They claim that an overwhelming majority of witnesses, including character witnesses who will be called in this case, are residents of Cedar Rapids, Iowa. I do not give this factor much weight. Witnesses, especially character witnesses, from Iowa can be called by means of teleconferencing if the defense so desires. This court has the technology available to accommodate teleconferencing. It has been successfully utilized in other criminal matters with proper limiting instruction to the jury. In any event, this is not a case where a transfer is required in the interests of justice because the Defendants are without financial means to pay for traveling expenses and where travel and transportation should present serious difficulties.

The location of defense counsel is not a significant factor. Of the five defense counsel who have entered appearances in this matter, none is a resident of the Northern District of Iowa. As for the two defendants likely to go to trial, counsel for Defendant Reeve resides and practices in Miami, Florida, and counsel for Defendant Stickle lives and practices in the Chicago area and litigates cases throughout the United States. Defendant Stickle's counsel has failed to establish why trying the case in Miami is more onerous than trying it in Cedar Rapids, Iowa.

The relative accessibility of place of trial is the most significant factor in favoring of denying the motion to transfer. The Government's witnesses have widely disparate residences both within and without of the United States, particularly those who are employed in the maritime Industry. To assist, I have set a date certain for commencement of trial. Miami is a far more accessible location for trial than Cedar Rapids, especially given the wide range of international and domestic flight options into the Miami International Airport. From the statistics provided by the parties, it is apparent that the Eastern Iowa Airport has far less commercially available flight options than does the Miami International Airport. Furthermore, it has no direct international alternatives.

The condition of the docket in each district is also a factor, albeit not a controlling one. I already have specially set the matter for trial on October 25, 2004. A trial in the Northern District of Iowa would not commence at an earlier date, especially given the conflicts expressed by all counsel at various status conferences. Moreover, at oral argument, the Government has advised that the district judge assigned to

the Sabine corporate sentencing has entered an order recusing herself, thereby leaving only one remaining district judge in the Northern District of Iowa to hear this matter (if transferred). That district judge currently has two death eligible pending criminal murder trials. One was set to commence in August and the other in January of 2005. Finally, the Northern District of Iowa has had to recruit judges from neighboring districts to avoid criminal speedy trial problems. According to the Government, if transferred, this case would not be heard until the Spring or Summer of 2005.

Finally, I find without merit the special factor suggested by the defense that the prosecutors manufactured venue in Florida on the belief that a Miami jury would treat environmental offenses involving the high seas more harshly than a Cedar Rapids jury.[5] I conclude that further comment of this ground is unnecessary. The defense has made no convincing showing that the Government has acted improperly or that a Miami jury would be any more or less fair than an Iowa jury. In any event, a defendant is not entitled to a transfer on the ground that a jury in another district would be more sympathetic to him. *See*, e.g., *United States v. Jordan*, 223 F.3d 676, 689 (7th Cir.2000)(venue is not the defendant's choice to be determined on the basis of where he believes a jury might be more sympathetic to his political view). For these reasons, the motion is denied.

## III. DEFENDANTS' JOINT MOTION TO DISMISS COUNT 1 OF THE INDICTMENT FOR LACK OF VENUE AND TO STRIKE OVERT ACT 20 [D.E. # 48]

Defendants Stickle and Reeve move, pursuant to Article III, Section 2 of the Constitution, 18 U.S.C. § 3237, and Fed. R.Crim.P. 7(d), 12(b) and 18, for an order dismissing Count One of the Indictment for lack of venue in the Southern District of Florida and striking Overt Act 20 of Count One as surplusage.[6] I conclude that

---

5. The Government takes issue with the defense assertion that the indictment in this case is simply the restatement of an environmental investigation conducted over the past several years in the Northern District of Iowa. The Government claims that the investigation involved examination of a fleet of twelve ocean-going vessels operated by Sabine Transportation Company and involving unlawful discharge of oily wastes and other pollutants in the territorial and internal waters of the United States as well as on the high seas. The Government states that: "[D]uring the corporate investigation, the United States sought negotiated resolutions with the senior shipboard officers and other corporate officers who had responsibility for directing or causing the unlawful discharge from the *Juneau*, so that the entire case could potentially be resolved in the Northern District of Iowa with venue predicated on the residency of the corporate defendant. However, the efforts to resolve the issue of potential individual liability for the discharge of the diesel contaminated grain were consistently rebuffed by the individual targets." [Government's response to joint motion to transfer, page 3][D.E. # 40]. The Government opines that, confronted with the breakdown of plea negotiations, and the pending statute of limitation, the case was initiated in the Southern District "... [w]here the United States was able, at that point, to predict with any confidence that venue could reasonably be established, *i.e.* the district of residence of defendant Hitchens, the former Chief Officer of the *Juneau;* the first line supervisor of the crew and laborers aboard the ship who dumped the diesel contaminated wheat overboard." *Id.* at page 6.

6. Overt Act 20 alleges that: "On April 6, 1999, a co-conspirator known to the Grand Jury, previously the Chief Officer aboard the Juneau during the voyage from Singapore to Portland, Oregon, was interviewed by Special Agents of the Federal Bureau of Investigation in West Palm Beach, Florida and falsely stated that there was only a trace amount of diesel fuel in the contaminated wheat that was on board the *Juenau* in an effort to convince the investigators that the contaminated wheat had been discharged lawfully."

the Indictment states sufficient allegations as to Count One to avoid dismissal based on improper venue. Further, I deny the motion to dismiss Overt Act 20 of Count One as surplusage.

Count One of the Indictment alleges that Defendants Stickle, Reeve and Karayannides conspired "within the Southern District of Florida and elsewhere," beginning on or about December 22, 1998, and continuing through May 27, 1999, in violation of 18 U.S.C. § 371, to: (1) knowingly cause the discharge of diesel contaminated wheat from the *S.S. Juneau* in alleged violation of 33 U.S.C. § 1908(a); (2) to obstruct the U.S. Department of Transportation and the U.S. Coast Guard by making "false and misleading statements" to Coast Guard officials, in alleged violation of 18 U.S.C. § 1505; and (3) to "defraud" the Coast Guard and the U.S. Department of Agriculture by allegedly making the same or similar false statements.[7] Since Count One expressly alleges that the crime occurred at least, in part, "within" this District, the Government has based venue

for Count One on 18 U.S.C. § 3237(a).[8] The Defendants acknowledge that Overt Act 20–the post-discharge interview of Hitchens in the city where he resided, West Palm Beachtook place in the Southern District of Florida, but argues that this act was not in furtherance of the conspiracy charged in Count One, as a matter of law. Citing *to Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the defense argues that there is a vital distinction between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up the crime.

█ Here, according to the defense, the allegation in Overt Act 20 involves a statement made to a criminal investigatory agency, the FBI, two months after the substantive offense was fully completed. According to the defense, statements made to the FBI in Florida in April 1999 had no

---

**7.** The Indictment alleged that the Defendants unlawfully agreed to violate the laws of the United States as follows:

A. *Discharge of Oil and Oily Mixture:* To knowingly discharge and cause to be discharged from a ship of more than 400 gross tons oil and oily mixture, to wit, approximately 442 metric tons of diesel-contaminated wheat and diesel fuel, into the sea without the use of an oil discharge monitoring and control system in violation of Title 33, United States Code, Section 1908(a).

B. *Obstruction of an Agency Proceedings:* To corruptly endeavor to influence, obstruct and impede the due and proper administration of the law under a pending proceeding by the United States Department of Transportation and United States Coast Guard, by presenting the United States Coast Guard with false and misleading statements and records, knowing that the statements and records were false and misleading and that the Coast Guard was conducting a proceeding to determine whether the vessel had operated and was operating in compliance with the law, in

violation of Title 18, United States Code, Section 1505.

C. *Defraud the United States:* To defraud the United States, that is to hamper, hinder, impede, impair and obstruct by craft, trickery, deceit, and dishonest means, the lawful and legitimate functions of the United States Coast Guard in enforcing the federal environmental laws and regulations, and the Department of Agriculture and its agency, CCC, in enforcing the laws and regulations governing the carriage and delivery of donated agricultural commodities.

Indictment, ¶ 16, at pp. 5–6.

**8.** Section 3237(a) provides in pertinent part: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued or completed ...."

potential to further the allegedly illegal dumping in the South China Sea in February, 1999.

In response, the Government argues that the Defendants' Joint Motion fundamentally misstates the nature and scope of the conspiracy actually charged in the Indictment. I concur with the Government's argument.

The essence of the Defendants' main argument is that: (1) the conspiracy alleged in Count One is only a "discharge conspiracy;" (2) the discharge of the contaminated grain is alleged to have been completed on or about February 7, 1999; (3) Overt Act 20, which alleges that one of the co-conspirators made a false statement to criminal investigators on April 6, 1999 in the Southern District of Florida, was merely an effort to conceal a crime that had already been completed; (4) pursuant to the doctrine enunciated by the Supreme Court in *United States v. Gruenwald*, Overt Act 20 was not in furtherance of the conspiracy; and (5) because venue is based on Overt Act 20, Count One should be dismissed for lack of venue in the Southern District of Florida.

The inherent problem with the Defendants' argument is that it ignores the identification of the central purposes of the conspiracy alleged in the Indictment and the actual duration of the conspiracy. The Government convincingly argues that, based on the allegations of the Indictment, the three objectives of the conspiracy are interconnected and its duration continued until the purposes of the conspiracy were completed. Here, the first objective of the conspiracy, the unlawful discharge of oil and an oily mixture, was largely accomplished by February 7, 1999 when the contaminated grain dumping operation was completed. Indictment, ¶ 21, Overt Act 16, page 10. However, the second objective (obstruction of an agency proceeding) and the third objective (defrauding the United States Coast Guard and the Department of Agriculture) had neither been accomplished nor abandoned by the time the last alleged overt act was performed on May 27, 1999. *Id.* Overt Act 21, pages 11–12. A complete reading of the Indictment and its multiple objectives substantiates the Government's position that the duration of the charged conspiracy must have continued at least through May 27, 1999.

The point here, and what distinguishes the core holding of the Supreme Court in *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953) and *Gruenewald*, is that the acts of concealment are part of the charged conspiracy, as compared to a subsidiary conspiracy to conceal after the central criminal purposes of the conspiracy have been attained. *See United States v. Mann*, 161 F.3d 840, 859 (5th Cir.1998), *reh'g and suggestion for reh'g en banc denied*, 168 F.3d 488 (1999), *cert. denied*, 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999), *cert. denied sub nom., Moore v. United States*, 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999)("[A]cts of concealment are in furtherance of the conspiracy for limitations purposes where the nature of the conspiracy is such that concealment is part of or in furtherance of the main objectives of the conspiracy").

Count One of the Indictment alleges several acts of deception, false statements and concealment by certain co-conspirators during the pendency of the conspiracy and in furtherance of its central objectives. Indictment, § 21, Overt Acts 2, 4, 9, 11, 12, 17, 18, 19, 20 and 21. These acts of deception and concealment are alleged to have occurred both prior to and subsequent to the alleged unlawful dumping of the diesel contaminated grain and are alleged to have been performed in, and in furtherance of,

the multiple objectives of the conspiracy. According to the Government, the acts are integral to the central objective charged in the conspiracy because the Defendants were operating in the face of continual regulatory oversight. As demonstrated by the alleged conduct of the co-conspirators subsequent to February 7, 1999, the central purposes of the conspiracy had not been accomplished once the diesel contaminated grain was dumped in the ocean. Rather, the co-conspirators are alleged to have continued to act in furtherance of their overall conspiratorial objectives at least through May 27, 1999, the date that Defendant Reeve allegedly mailed a document to a Coast Guard official in Washington, D.C. who was conducting a separate administrative investigation into the overall safety and environmental performance of the Sabine fleet, falsely stating that, "[i]f environmental statutes were in fact violated [with respect to the *Juneau* dumping incident] the violation occurred without the knowledge, authorization or consent of the shore-based management of the company." Indictment, ¶ 21, pages 11–12.

According to the Government, Overt Act 20, involving a different false statement allegedly made on April 6, 1999, in the Southern District of Florida, was not merely an effort to conceal a crime that had already been completed, but was an act of concealment performed in furtherance of the two remaining criminal objectives of the conspiracy. Whether this is ultimately so is a matter that can be propounded to the jury by special interrogatory. If the jury finds it was not in furtherance of the two remaining objectives of the conspiracy, then, I still may consider dismissal of Count One for grounds stated in the defense motion at that time.[9]

## IV. DEFENDANTS' JOINT MOTION TO DISMISS PORTIONS OF COUNT I OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE AND FOR BEING FATALLY DUPLICITOUS [D.E. # 49].

The Defendants raise three separate challenges to the second objective of the conspiracy charged in Count One. First, the Defendants contend that the section 1505 obstruction objective set forth in the conspiracy count should be dismissed or struck as a matter of law because there was no pending Coast Guard "proceeding," which is a required element under Title 18, U.S.C. § 1505. Second, the Defendants argue that the section 1505 obstruction objective should be dismissed or struck because the obstructive conduct was not in furtherance of the conspiracy which the Defendants seek to characterize as merely a conspiracy to dump the diesel contaminated wheat into the ocean. I have already considered and rejected this argument. Third, the Defendants argue that the section 1505 obstructive objective of the conspiracy count is duplicitous because the count improperly charges the Defendants with violations of both prongs of 18 U.S.C. § 371 based on the same conduct under the second and third objectives. The Defendants contend that the Government cannot charge as separate objectives of a single section 371 conspiracy both an agreement to violate the first prong of section 371 through an agreement to violate a false statement statute (in this case section 1505), and an agreement to violate the second prong of section 371 through an agreement to "defraud" the same agency

---

9. The motion to strike Overt Act 20 as prejudicial surplusage is predicated on the same arguments as previously raised by the Defendants. Notwithstanding these arguments, Overt Act 20 is sufficiently pled as an act in furtherance of the objectives of the conspiracy in which the Defendants participated.

of the United States of "truthful information" through the same false statements. I conclude that none of these arguments has merit and, therefore, each is denied.

■ As mentioned, the Defendants contend that the section 1505 objective should be dismissed or struck from Count One because there was no pending "proceeding" as required by that statute. In reliance, the Defendants cite *United States v. Aguilar*, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). *Aguilar* is not determinative, however, because it addressed the explicit language of section 1503, a more narrowly tailored statute.[10] In contrast, the cases interpreting the term "pending proceedings" under Section 1505 have concluded that the term applies to a wide range of agency proceedings, including preliminary agency investigative activities.[11] *See*, e.g., *United States v. Schwartz*, 924 F.2d 410, 423 (2nd Cir.1991) ("The term 'any proceedings' as used in Section 1505 has been broadly defined")(concluding that even though interviews by Customs officials may have been investigative in nature, the activity qualified as a proceeding under the statute); *United States v. Browning*, 572 F.2d 720, 724 (10th Cir.), *cert. denied*, 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978)(fact that false statements procured by the defendant were made during the course of an "investigation or the search for the true facts" did not render it a "non-proceeding"); *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970)('proceeding' a term of "broad scope, encompassing both the investigative and adjudicative functions of a department or agency"); *Bailey v. United States*, 35 F.3d

10. Title 18 U.S.C. § 1503(a) provides: "Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished ...."

By contrast, Title 18 U.S.C. § 1505 provides, in pertinent part: "Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceedings is being had before any department or agency of the United States ... shall be fined ... or imprisoned ...."

11. The Eleventh Circuit has not directly construed the meaning of "pending proceeding" under 18 U.S.C. § 1505. In *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir.1997), the Eleventh Circuit acknowledged, citing *United States v. Poindexter*, 951 F.2d 369 (D.C.Cir.1991), *cert. denied*, 506 U.S. 1021, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992), that " 'the language of § 1505 is materially different from that of § 1503 and found cases construing § 1503 were not instructive in their analysis as to whether the term 'corruptly' in § 1505 was unconstitutionally vague." Defendants argue that the Eleventh Circuit, in *United States v. Vaghela*, 169 F.3d 729 (11th Cir.1999), narrowly construed the "pending proceedings" element of Section 1503 as no longer including false statements to mere investigators. But, it is unclear where the court construed the "pending proceeding" element at all, as compared to holding that Section 1503 required the government to "demonstrate that the actions the conspirators agreed to take were directly intended to prevent or otherwise obstruct the process of a specific judicial proceeding in a way that is more than merely 'speculative.' " *Id.* at 734–35.

1118, 1121 (9th Cir.1994)(investigations that have been found to constitute "proceedings" under § 1505 have generally involved agencies with some discretionary or adjudicative power to enhance their investigations through the issuance of subpoenas or warrants, and must be more than a "mere police investigation"). I conclude that the Eleventh Circuit would likely follow this line of authority and hold that the term "pending proceeding" includes investigations by agencies that have discretionary or adjudicative power, or that have the power to enhance their investigations through the issuance of subpoenas or warrants.

Next, Defendants argue that, in any event, there was no pending Coast Guard proceeding in this case within the meaning of *Aquilar.* Nonetheless, the factual allegations and the statutory and regulatory citations set forth in Count One are sufficient to allege that the investigation being conducted by the United States Coast Guard's Office of Compliance during the period of the alleged conspiracy constituted a "pending proceeding" under section 1505. The investigation was being conducted by the staff of the Chief of the Office of Compliance. Indictment, §§ 11 and 12, pages 3 and 4. As alleged, the Coast Guard is authorized to examine a vessel's records to determine, among other things, whether the vessel has discharged any oil or oily mixtures in violation of MARPOL, APPS, or any other applicable federal regulation, and may issue subpoenas to require the attendance of witnesses or the production of documents or other evidence to determine whether a vessel is in violation of MARPOL or APPS. Indictment, ¶ 12. In Overt Act 21, it is alleged that Defendant Reeve, in response to a communication from a United States Coast Guard official requiring Sabine to investigate and analyze a series of incidents and casualties involving Sabine vessels, including the report that a cargo of grain con-taminated with diesel had been dumped from the *Juneau* in February 1999, falsely stated that, "if environmental statutes were in fact violated the violation occurred without the knowledge, authorization or consent of the shore based management of the company." Indictment at pages 11 and 12.

It is not for this Court to examine at this time the sufficiency of the evidence as to the nature of the United States Coast Guard's investigation, if any. The Defendants' erroneously invite the court to do so by reference to Captain Pontiff's letter to the effect that the alleged false statements at issue were not made to a "pending proceeding" but to a Coast Guard investigator. By looking beyond the face of the indictment and inviting ruling on the merits of the charges, I would be in effect granting summary judgment in favor of the Defendants. The Eleventh Circuit has clear binding precedent to the contrary. *See United States v. Salman,* 378 F.3d 1266, 1267 (11th Cir.2004)(citing cases), The sufficiency of a criminal indictment is determined on its face. The indictment is sufficient if it charges in the language of statutes. *Id.* Because the Defendants are properly indicted, the Government is entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal pursuant to F.R.Crim.P. 29. *Id.* at 1268.

Finally, the Defendants claim that Count One should be dismissed because it is duplicitous; that is, it improperly pleads both prongs of section 371 for the same alleged conduct. According to the Defendants, section 371 can be violated in either of two ways-either by defrauding a federal agency or by violating other federal statutes. The Defendants claim that Count One alleges that the same conduct has violated both prongs. In support of their argument, the Defendants primarily rely

on *United States v. Haga*, 821 F.2d 1036 (5th Cir.1987), and *United States v. Minarik*, 875 F.2d 1186 (6th Cir.1989).

■ Neither case supports the Defendants argument because neither case directly involved an indictment that charged both prongs under section 371. More persuasive are cases from other circuits[12] which have expressly addressed the duplicity argument and have held that section 371 creates a single offense but specifies alternative means to commit the offense. *See,* e.g., *United States v. Williams*, 705 F.2d 603, 623–24 (2nd Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983)(rejecting appellants' duplicity claim where the indictment charged in a single count conspiracy to defraud the United States and to commit substantive offenses); *United States v. Smith*, 891 F.2d 703, 711–13 (9th Cir.1989)(indictment charging conspiracy to defraud the United States and to commit substantive offenses in a single count was not unconstitutionally duplicitous; two clauses of § 371 establish alternative means of commission rather than two distinct conspiracy offenses). *See also United States v. Treadwell*, 760 F.2d 327, 336 (D.C.Cir.1985)("[A] single conspiracy may contemplate ... the violation of one or more federal statutes in addition to defrauding the United States").

■ Consistent with these cases, I conclude that Count One of the indictment is not duplicitous, but properly alleges multiple objectives of a single unlawful conspiracy. There is no basis for dismissing or striking the section 1505 objective from Count One. The Government argues, and I concur, that the Defendants are in error in stating that the conduct and overt acts alleged in Count One to have been committed in furtherance of the second objective of the conspiracy (the obstruction objective) is the same conduct and overt acts committed in furtherance of the third ob-

12. A count in an indictment is duplicitous if it charges two or more "separate and distinct" offenses. *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir.1989). A duplicitous count poses three dangers: "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." *United States v. Wiles*, 102 F.3d 1043, 1061 (10th Cir.1996) (finding no duplicity where the indictment merely alleged multiple means or methods of committing a single offense), modified, 106 F.3d 1516 (10th Cir. 1997). Under this analysis, the key issue to be determined is what conduct constitutes a single offense. But, whether a count is duplicitous is to be determined solely by reference to the face of the indictment. *United States v. Sharpe*, 193 F.3d 852, 866 (5th Cir.1999)(allegation of duplicity is analyzed by assessing the indictment to determine whether it can be read to charge only one violation in each count).

The Eleventh Circuit has not expressly dealt with the § 371 duplicity issue. However, in *United States v. Hope*, 861 F.2d 1574 (11th Cir.1988), the court addressed a conspiracy count to both "defraud the United States and to conceal and coverup material facts ... in violation of § 371". The court dismissed the count because it improperly alleged that the county agencies were the targets of the conspiracy rather than the United States. But, in rejecting the defendant's claim that the count should be dismissed for duplicity, the court stated in a footnote, in a manner persuasive here, that: "While it is true the courts have interpreted the "defraud the United States" and the "commit any offense" clauses of § 371 as separate offenses (citations omitted), it is well established that a single conspiracy count may properly allege multiple objectives (citation omitted). The Supreme Court stated in *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), that the allegation in a single count of a conspiracy to commit several crimes does not render the count duplicitous, for '[t]he conspiracy is the crime and that is one, however diverse its objectives.' (citations omitted). Count I alleges a single conspiracy in violation of § 371, with two separate objects, and is not duplicitous." *Id.* at 1578 n. 8.

jective (the defrauding of the Coast Guard and the Department of Agriculture). Certain overt acts were performed to defraud and deceive Coast Guard officials at the Marine Inspection Detachment in Singapore (Indictment, § 21, Overt Act 11), while other overt acts were performed and other conduct engaged in to defraud different Coast Guard officials at the Marine Safety Office in Portland Oregon, and impair their ability to perform their lawful functions (Indictment, § 21, Overt Act 9). Separate overt acts were allegedly performed by the co-conspirators to defraud an agent of the Commodity Credit Corporation (Indictment, Overt Acts 12 and 17). All of these are separate from Overt Act 21, the allegedly false statement submitted to a Coast Guard official in Washington, D.C. For all these reasons, I deny the motion.

## V. DEFENDANTS' JOINT MOTION TO DISMISS COUNT TWO OF THE INDICTMENT FOR LACK OF VENUE [D.E. # 50].

■ Defendants Stickle and Reeve move, pursuant to Article III, Section 3 of the Constitution, 18 U.S.C. § 3237, and Rules 12(b) and 18 of the Federal Rules of Criminal Procedure for an order dismissing Count Two of the Indictment for lack of venue. Count Two of the Indictment alleges that Defendants Reeve, Karayannides, McKay and Hitchens violated 18 U.S.C. § 2, 33 U.S.C. § 1908(a) and various regulations and treaty provisions by discharging the allegedly still contaminated wheat from the *S.S. Juneau* while on the high seas.[13] Defendants Stickle and Reeve argue that 18 U.S.C. § 3238 [14] is unavailable for venue for Count Two for two reasons. First, the Defendants argue that since most of the acts allegedly constituting the aiding and abetting offense took place in Iowa, a "Particular State," Section 3238 is inapplicable. Second, the Defendants contend that since they have never been fugitives and were known to reside in Cedar Rapids, the "last known residence" clause of Section 3238 is inapplicable. In response, the Government argues that 18 U.S.C. § 3238 applies here because the discharge crime alleged either begun or was committed on the high seas, and that the section authorizes prosecution in the Southern District because this district is the last known address of a joint offender. Furthermore, the Government argues that venue is appropriate under section 3238 even if venue may be found in another district, and that Title 18, United States Code, Section 2 does not establish a separate crime for venue purposes. While, ultimately, the jury will need to resolve certain of the factual issues relating to venue, I conclude, at this juncture, that venue for Count Two properly lies in the Southern District of Florida

---

**13.** Count Two charges five defendants and claims that while on the high seas, during a six day period in February 1999, the defendants knowingly discharged and caused to be discharged approximately 442 metric tons of diesel-contaminated wheat and diesel fuel into the sea without use of an oil discharge monitoring and control system. It further charges that Philip J. Hitchens, a named defendant, with being a resident of the Southern District of Florida.

**14.** Title 18, U.S.C. § 3238 [Offense not committed in any district] states: "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; bout if such offender or offenders are not so arrested or brought into any district, an indictment may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia."

Article III, Section 2 of the Constitution establishes that if an offense is "not committed within any State, the Trial shall be at such Place or Places as the Congress may by law have directed." Title 18, United States Code, Section 3238, plainly applies to crimes begun or committed upon the high sea ["The trial of all offenses begun or committed upon the high seas...."]. Count Two alleges that the diesel-contaminated wheat was discharged "... into the sea...." If there was any doubt about where the offense occurred, Count One alleges in Overt Act 16 that Defendants Stickle, Reeve, Karayannides, then serving as the Master and Chief Officer of the Juneau, "... discharged and caused the discharge of approximately 442 metric tons of diesel-contaminated wheat and diesel fuel into the sea from the *Juneau* while the ship was on the high seas ...." It is alleged in Count Two that the discharge violated, among other regulations, Title 33, Code of Federal Regulations, Section 252.20(a). While a United States registered ship can commit violations of Title 33 U.S.C. § 1908(a) wherever it is located, as charged in Count Two, the discharge must have occurred beyond the 12 nautical miles from the nearest land to violate Title 33, Code of Federal Regulations, Section 151.10(a). Accordingly, the Indictment sufficiently alleges that the dumping occurred on the high seas, which by definition, is "... out of the jurisdiction of any particular State or district." Whether or not this occurred as alleged is a jury question which can be answered by special interrogatory.

Section 3238 is an appropriate basis for venue so long as the alleged act of discharge began or was committed on the high seas, and outside the jurisdiction of any district, irrespective that Defendants Reeve and Stickle may have aided and abetted the crime while in the United States. The allegations of the Indictment are sufficient in this regard so as to preclude dismissal in the context of a pre-trial motion. *United States v. Levy Auto Parts*, 787 F.2d 946, 950–952 (4th Cir.) (finding venue appropriate under § 3238 when conspiracy was "essentially foreign," even when some overt acts occurred inside United States), *cert. denied*, 479 U.S. 828, 107 S.Ct. 108, 93 L.Ed.2d 56 (1986); *United States v. Erwin*, 602 F.2d 1183, 1185 (5th Cir.1979) (per curiam) ("That venue may also be appropriate in another district will not divest venue properly established under § 3238."), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); *United States v. Williams*, 589 F.2d 210, 213 (5th Cir.1979) ("The venue statutes are not mutually exclusive, and a suggestion that venue is proper under § 3237(a) will not serve to divest venue from another judicial district if venue is proper in that district under § 3238."), adopted in pertinent part, 617 F.2d 1063, 1071 (5th Cir.1980) (en banc); 2 Charles Alan Wright, Federal Practice and Procedure § 304 (3d ed.2000) ("[§ 3238] is a continuing-offense statute. If an offense is begun or committed ... out of the jurisdiction of any particular state or district, venue is proper in which the offender is arrested or first brought even though parts of the crime were committed in some other district so that venue might have been proper there."); *see also United States v. Jensen*, 93 F.3d 667, 671 (9th Cir.1996) (Fletcher, J., concurring) ("That the defendants also operated their vessels within the District of Alaska does not remove section 3238's applicability-the alleged offense was still 'begun or committed' upon the high seas during the period charged.") (citing 8A James A. Moore et al., Moore's Federal Practice ¶ 18.06[3] (2d ed.1995)) (additional citations omitted).

Though some acts of aiders and abetters in this case allegedly occurred inside the United States, the essence of the offense charged in Count Two was to effectuate an

illegal disposal upon the high seas. The offense at issue is not, intrinsically, an aiding and abetting offense but rather an unlawful discharge of pollutants upon the high seas. *See* 33 U.S.C. § 1908(a). *See also United States v. Breitweiser,* 357 F.3d 1249, 1253 (11th Cir.2004)( "The *locus delicti* [of a crime] must be determined from the nature of the crime alleged and the location of the acts constituting it"). By virtue of the operation of 18 U.S.C. § 2, Defendants Reeve and Stickle, upon conviction, would be punishable as "principals," having been charged with an offense against the United States. In other words, if found guilty, they, as culpable aiders and abettors, would be held accountable as if they were physically present on the high seas aboard the *S.S. Juneau.*

While I conclude that the first prong of Section 2038 has been met, as alleged, the next question is whether the other remaining conditions precedent to venue are also met. Section 2038 further provides that trial shall be where the offender, or any one of two or more joint offenders, is arrested or first brought. For purposes of reviewing this motion, however, it is sufficient to note that Defendants McKay and Krider, two joint offenders, had resided outside the Southern District of Florida and were "first brought" into the district for their plea agreements. [D.E. # s 17 and 19]. The record is unclear if they were previously arrested but the docket sheet indicates no such arrests.[15] It would, therefore, appear that venue is appropriate here on this ground alone, without resorting to Hitchen's residency in the Southern District of Florida, or determining whether Defendants Stickle and Reeves were actually "arrested" while in Iowa in accordance with the arrest warrants issued in this district after the Indictment was returned. In any event, the facts establishing venue must be established at trial and determined by the jury.

## VI. DEFENDANTS JOINT MOTION TO DISMISS COUNTS ONE AND TWO UNDER THE RULE OF LENITY ON THE BASIS THAT 33 C.F.R. § 151.10(a) IS UNCONSTITUTIONALLY VAGUE [D.E. # 47].

Defendants Stickle and Reeve argue that Counts One and Two must be dismissed as a matter of law under both under the rule of lenity and the vagueness doctrine because the relevant statutory prohibition is not sufficiently definite to satisfy constitutional standards. In support, the Defendants rely on the Ninth Circuit decision in *United States v. Apex Oil Co., Inc.,* 132 F.3d 1287 (9th Cir.1997).

An analysis of Defendants' arguments begins with a review of the applicable language of the Indictment itself, the applicable federal statutes and federal regulations, and relevant portions of the international treaty, as cited in the Indictment. Count Two charges the Defendants with discharge of oil and oily mixture from a ship of more than 400 gross tons, namely 442 metric tons of diesel-contaminated wheat and diesel fuel, " . . . in violation of Title 33, United States Code, Section 1908(a); Title 33,

---

**15.** The Government contends that the first, and mandatory, choice of forum under section 3228 does not resolve the question because " . . . none of the defendants charged in Count 2 were arrested or brought into *any* district prior to charges being preferred in this case." Government's Reply, [D.E. # 65, page 4]. While I have denied the Defendant's pre-trial motion to dismiss Count Two based on venue at this preliminary stage, the Government is hereby placed on notice that further legal research as well as the determination of factual issues by the jury by special interrogatory verdicts will be required before the issues raised by the Defendants under the three tier scheme of § 3228 can be finally resolved.

Code of Federal Regulations, Section 151.10(a), MARPOL[an international treaty implemented by the United States Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901, *et.seq.],* Annex I, Regulation 9; and Title 18, United States Code, Section 2." The cited criminal provision of APPS provides, in relevant part, that "a person knowingly violates the MARPOL [16] Protocol, ... this chapter, or the regulations issued thereunder commits a class D felony." 33 U.S. § 1098(a).

The Indictment alleges that the MAPOL Protocol is an international treaty that sets forth standards for the maximum amount of oil and oily mixtures permitted to be discharged from vessels. Indictment, ¶¶ 9 and 10, page 3; MARPOL Protocol, Annex. I. This standard is 15 parts per million ("ppm") of oil when the vessel is within 12 nautical miles of land, and 100 ppm when the vessel is more than 12 nautical miles from land. Indictment, ¶ 10, page 3. MARPOL Annex I, Regulation 9; and 33 C.R.R. § 151.10. The MARPOL Protocol and the regulations promulgated pursuant to the APPS statute set forth a series of conditions which must be satisfied in order for such discharges of oil and oily mixtures to be lawful, including the requirement that vessels have and maintain an oil discharge monitoring and control system to prevent the discharge of oily mixtures containing more than the legally permitted concentration of oil. Indictment, ¶ 10, page 3; MARPOL Annex I, Regulation 16,

33 C.F.R. § 151.10. The terms "oil" and "oily mixture" are defined both by the APPS regulations and by MARPOL Annex I in essentially identical language.

The relevant provisions of the APPS regulations define "oil" to mean "petroleum in any form including crude oil, fuel oil, sludge, refuse and refined products." 33 C.F.R. § 151.05. The relevant provisions for "oil" under MARPOL, Annex I is "petroleum in any form, including crude oil, fuel oil, sludge, oil refuse, and refined products ... and, without limiting the generality of the foregoing, includes the substances listed in Appendix I to this Annex." MARPOL Annex I, Regulation 1(1). Appendix I to Annex I lists "diesel oil" as one of the substances specifically covered under the definition of oil. It defines "oily mixture" as "a mixture with any oil content." *Id.*

The Defendants argue that under the rule of lenity, they cannot be held to have knowingly violated the MARPOL Protocol, the applicable statute, or the regulations promulgated thereunder because the relevant regulations are susceptible to more than one meaning and are irreconcilably vague. The Defendants contend the terms "oil" and "oily mixture" are insufficiently definite to adequately notify and inform the public of the specific conduct that is subject to criminal penalties. Moreover, the Defendants argue that the conduct allegedly engaged in consist only of a discharge of "operational waste," which is lawful under APPS.[17]

16. The APPS statute defines the MARPOL Protocol as the Protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships, 1973, and includes the Convention; .... 33 U.S.C. § 1901(a). The "Convention" is further defined to mean "the International Convention from the Prevention of Pollution from Ships, 1973, including Protocols I and II and Annexes I, II and V thereto, including any modifications or amendments to the Convention, Pro-

tocols, or Annexes which have entered into force for the United States; ...." 33 U.S.C. § 1901(a)(4). The MARPOL Protocol was sighed by the United States on June 27, 1978. H.R.Rep. No. 96–1224, 96th Cong.,2d Sess. 4 (1980). The treaty was ratified by the Senate on July 2, 1980. 126 Cong.Rec. S9263–72 (daily ed. July 2, 1980).

17. I reject this last argument summarily for purposes of this motion to dismiss. The Indictment does not charge the Defendants with

Under the rule of lenity, "where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant." *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity"). The rule is based on the principle that "[a] fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States v. Bass*, 404 U.S. at 348, 92 S.Ct. 515. However, the rule of lenity only applies if a statute is ambiguous. *United States v. Jeter*, 329 F.3d 1229, 1230 (11th Cir.2003).

I conclude that the APPS statute, the MARPOL Protocol and Annex I to the MARPOL, and the APPS regulations unambiguously prohibit the discharge of diesel fuel, and 442 metric tons of diesel-contaminated wheat into the ocean, as charged in the Indictment, without the use of oil content monitoring and control equipment. Under the related vagueness doctrine, I conclude that the referenced statute, Convention and regulations "define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (citations omitted);

*United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir.2002)(" 'As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement' ") (citation omitted).

Here, the APPS statute unambiguously states that a person who knowingly violates the statute, the MARPOL Protocol (including Annexes I, II, and V of MARPOL) or a regulation issued thereunder commits a class D felony. MARPOL Annex I, Regulation 9, states that discharges of oil or oily mixtures are prohibited unless conditions set forth in that regulation are met, namely that such discharges be made with the use of a properly functioning oil discharge monitoring and control system. MARPOL, Annex I, Regulation I, defines oil to mean "petroleum in any form including "fuel oil, ... and refined products ...." That definition references a list of substances set out in Appendix I, and diesel oil is contained in that list. Additionally, 33 C.F.R. § 151.10(a) (effective July 1, 1998) states that discharge of oil and oily mixtures are prohibited unless the conditions set forth in that regulation are met, including the condition that such discharges be made with the use of properly functioning oil-water separating equipment, monitors and alarms. The term "oil" is also defined in those regulations to mean "petroleum in any form, including ... fuel

discharge of "operational waste" and I do not find that, given the allegations of the Indictment, such a definition must apply here as a matter of law, or creates an reasonable ambiguity requiring application of the rule of lenity. The term "operational wastes" as defined in 33 C.F.R. § 151.05 is one of the components of the definition of the term "garbage" under the same regulation. The provisions governing the discharge of "garbage" are set forth in MARPOL Annex V and 33 C.F.R.

§§ 151.51 et seq. The definition of "garbage" as set forth in 33 C.F.R. § 151.05 and MARPOL annex V, Regulation 1, specifically excludes substances that are defined or listed in other Annexes to MARPOL 73/78, e.g. oil and oily mixtures. It is an unreasonable interpretation that the discharge of oil and oily mixtures would be permitted under the garbage regulations in direct contravention of the clear language to the contrary of the regulatory scheme.

oil, ... and refined products." 33 C.F.R. § 151.05 (effective July 1, 1998). Finally, both MARPOL and the APPS regulations defined "oily mixture" as a "mixture with any oil content." MARPOL Annex I, Regulation 1(2); and 33 C.F.R. § 151.05 (effective July 1, 1998).

In my view, the breadth of this definition sets out without reasonable ambiguity in common terms that diesel fuel is "oil" and diesel oil mixed with wheat is an "oily mixture" as a "mixture with oily content." Where, as in this case, a statute or regulation is aimed at a class of people with specialized knowledge of what is being regulated, then the specificity required by due process is measured by the common understanding of that group. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 501, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (examining vagueness of ordinance from the perspective of a "business person of ordinary intelligence"); *United States v. Weitzenhoff,* 35 F.3d 1275, 1289 (9th Cir.1993) (en banc) (holding that in evaluating the vagueness of a statute involving conduct of a select group of people, the statute may be upheld if the meaning of the statute is "well enough known to enable those within its reach to correctly apply [the law]"); *Precious Metals Assoc., Inc. v. CFTC,* 620 F.2d 900, 907–08 (1st Cir.1980) (holding that provisions of the Commodity Futures Trading Act prohibiting trading of commodity options were not unconstitutionally vague where members of regulated group were highly specialized and had thorough knowledge of what was prohibited). The test is whether the "language sufficiently conveys a definite warning as to the proscribed conduct, when measured by common understanding and commercial practice." *Precious Metals,* 620 F.2d at 907.

As alleged in the Indictment, Sabine Transportation Company was in the business of managing and operation United States flagged oceangoing vessels engaged in the transportation of various dry and liquid commercial cargos. Indictment, ¶ 1. The named defendants were the key operational officers of this company. Indictment, ¶¶ 3, 4 and 5. The Indictment charges the defendants with making and causing the making of detailed arrangements to accomplish the unlawful dumping of diesel-contaminated wheat from the *Juneau* without use of an oil discharge monitoring and control system, while preventing the government officials of several countries, including the United States from learning their plans to dump the contaminated wheat unlawfully, Indictment, ¶ 17. On the face of the Indictment, it cannot be said that these defendants, being in the shipping business, did not have fair warning of the boundaries of such criminal conduct.

I do not conclude that the Ninth Circuit's decision in *United States v. Apex,* 132 F.3d 1287 (9th Cir.1997) requires a different result. Rather, the facts and circumstances are plainly distinguishable from this case. In *Apex,* the material discharged into the sea by the defendants was "... not clearly material whose discharge is forbidden by 33 C.F.R. § 151.10 (1996), 'Control of discharge of oil.'" *Id.* at 1288. The indictment charged that, during the course of cargo tank cleaning operations following the transportation and discharge of liquid crude oil cargoes, the defendants had scraped off the solid, paraffin-like residue of the previous crude oil cargoes that had adhered to the cargo tank wall and had then discharged that waste material into the ocean. Because 33 C.F.R. § 151.10(c) did not plainly include oil constituents (muck or paraffin), the district judge found the term "cargo related oil residues" was unconstitutionally vague as applied to the facts and dismissed the conspiracy count under the rule of lenity. On review, the Ninth Circuit concluded

that the term "cargo related oil residue" and the then-current APPS definition of "oil." could not be seen as unambiguously including the solid, paraffin-like waste material. The Court further found that the term "residue" itself was ambiguous, and that the lack of specific definitions for several other terms utilized in § 151.10(c) added to the ambiguity of that regulation. While the definition of "oil" set forth in C.F.R. § 151.05 was one of the regulatory provisions considered, it was for the limited purpose of interpreting the term "cargo related oil residue" and evaluating whether the solid, paraffin-like waste disposed of plainly came within the meaning of "oil," and, thus, could be fairly understood to come within the meaning of "cargo related oil residue." The *Apex* analysis does not come close to the regulatory issue in this case as to whether diesel fuel and diesel-contaminated wheat plainly come within the meaning of "oil" and "oily mixture," respectively, as those terms are used in § 151.10(a).[18] Nor, contrary to Defendants' argument, do I find that the amendments in the year 2001 to the APPS regulations reflect a lack of clarity relevant to the issues here. These amendments did not affect the core language of the definitions of "oil" and "oily mixture" that are relevant to this case. These core definitions remain unchanged and required no clarification to alter any ambiguity. The new amendments purposes to ensure that the term "oil" should be understood to include oil in forms other than liquid, and such forms of oil should not be read out of the definition because they appear in a solid or semi-solid state. The second additional clause in the amended definition

does no more than crossreference a list of substances identified as oils in an appendix to Annex I of MARPOL. Accordingly, for all these reasons, I find no basis to apply the rule of lenity and to dismiss the Indictment.

**WHEREFORE,** it is **ORDERED** that the above motions [D.E. # s 28, 46, 48, 49 and 50] are **DENIED,** and the two non-substantive motions [D.E. # s 51 and 52] are granted in part and denied in part as above described.

---

**18.** The Government further seeks to distinguish *Apex* because, in that case, there was no *previous enforcement efforts against mariners* under APPS for the at sea disposal of solid, paraffin-like waste, while, in this case, there have been numerous criminal prosecutions of commercial vessel owners and operators, and others, for violations of APPS associated with the unlawful discharge of oil and oily mixtures and the failure to maintain accurate records regarding such discharges. For purpose of the motion to dismiss, I conclude it is not appropriate to take judicial notice of such matters.