**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**APEX OIL COMPANY, INC.; Trinidad Corporation; Anthony Schaeffer; Laurence V. Wade; John Sheppard; Kouichi Matsumoto; Donald K. Robertson, Defendants–Appellees.**

No. 96–30342.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1997.

Decided Dec. 29, 1997.

---

Robert B. Ross, Assistant United States Attorney, Portland, Oregon, John T. Stahr, Noreen McCarthy, Ellen J. Durkee, United States Department of Justice, Washington, DC, for plaintiff-appellant.

Marcus S. Topel, Gary K. Dubcoff, Topel & Goodman, San Francisco, California, for defendant-appellee Apex Oil Company, Inc.; Norman Sepenuk, Portland, Oregon, for defendant-appellee Trinidad Corporation; Douglas A. Stringer, Portland, Oregon, George D. Niespolo, Sideman and Bancroft, San Francisco, California, for defendant-appellee Anthony Schaeffer; E. Michael Murphy, Stolar Partnership, St. Louis, Missouri, for defendant-appellee Laurence V. Wade; Robert J. Breakstone, Landels Ripley & Diamond, San Francisco, California, for defendant-appellee John Sheppard; Michele B. Corash, Sean Mahoney, Morrison & Foerster, San Francisco, California, Marc D. Blackman, Portland, Oregon, for defendant-appellee Kouichi Matsumoto; Terry Burnet, Menees, Whitney and Burnet, Clayton, Missouri, for defendant-appellee Donald K. Robertson.

Before: JOHN T. NOONAN, Jr. and HAWKINS, Circuit Judges, and MERHIGE, Jr.,* District Judge.

NOONAN, Circuit Judge:

The United States appeals the dismissal by the district court of the first count of a five count indictment of the named defendants. The case turns on the meaning of the regulations governing the discharge of oil by ships subject to the 1980 Act to Prevent Pollution from Ships, 33 U.S.C. § 1901–1915 and Annexes I, II and V of the 1973 International Convention for the Prevention of Pollution from Ships (MARPOL), as modified by the 1978 International Conference on Tanker Safety and Pollution Prevention (the MARPOL Protocol). Interpreting these regulations in a criminal case of first impression in the circuit and in the country, we hold that the rule of lenity requires affirmance of the district court; the material discharged at sea by the defendants is not clearly material whose discharge is forbidden by 33 C.F.R. § 151.10 (1996), "Control of discharge of oil."

## PROCEEDINGS

On January 30, 1996 the grand jury returned a five-count superseding indictment against Apex Oil Company, Inc. (Apex); its subsidiary Trinidad Corporation (Trinidad); Kouichi Matsumoto, the manager of engineering for Trinidad; Donald Robertson, the manager of operations of Trinidad; and four captains of vessels owned by Apex, Max H. Lott and Anthony Schaeffer, captains of the *Admiralty Bay*; Laurence V. Wade, captain of the *Glacier Bay*; and John Sheppard, captain of the *Aspen*. The indictment charged that the defendants "did knowingly and willfully conspire and agree to discharge cargo-related oil residues in violation of Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, Section 151.10(c)."

The indictment stated that the four identified captains commanded the three identified ships which transported crude oil from Alaska to the West Coast of the continental United States; that from time to time these ships also carried grain to Africa, Asia or Russia; that, to transport the grain, the ships had to be cleaned of oil residues; that the cleaning "generated a substantial amount of cargo related oil residues" and also "generated waste material, such as oily rags, plastic

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern Virginia, sitting by designation.

suits, flashlight batteries, and plastic scrapers. The cargo-related oil residues and waste materials were disposed of at sea." Specifically, it was charged that the *Admiralty Bay* under the command of Captain Lott had discharged an undetermined amount of cargo-related oil residues (CRORs) between July 27, 1990 and August 10, 1990 and on September 8, 1990 had discharged CRORs and waste material contained in 113 metal 55–gallon drums; that on September 15, 1992 under command of Captain Schaeffer the *Admiralty Bay* had discharged CRORs and waste material from 252 metal 55–gallon drums; that on March 10, 1993 the *Glacier Bay* under command of Captain Wade had discharged 215 metal 55–gallon drums of CRORs and waste materials; and that from April 27 to April 29, 1993, the *Aspen* under command of Captain Sheppard had discharged an undetermined amount of CRORs and waste material in bags and drums.

The defendants moved to stay the trial of count one on the ground that primary jurisdiction belonged to the Coast Guard. This motion was opposed by the government and ultimately denied by the district court; the denial is not appealed. The district court also made unappealed rulings that the crime charged was a public welfare offense and that a general intent was all that needed to be proved.

After oral argument, the district court on September 18, 1996 declared that what the government was seeking to sanction was the discharge of "muck" remaining after the ships had undergone four phases of cleaning: a crude oil wash; a cold water wash with degreasers; a hot water wash with degreasers; and manual scraping that produced the muck. The court ruled: "Because the regulation does not plainly or unmistakably include oil constituents, muck or paraffin, and because other provisions regarding the disposal of cleaning waste arguably do include oil constituents, the rule of lenity mandates dismissal of the charge contained in Count 1."

The government moved for reconsideration, contending that there were factual issues as to the nature of the materials discharged. The district court found that "there is still no dispute that the subject materials are oil constituents, not oil, oil residue or sludge." The court added that it had found the regulatory term cargo-related oil residue to be "unconstitutionally vague as applied to the facts in this case under the rule of Lenity." The government's motion was denied.

The government appeals.

## ANALYSIS

It is a felony to violate the regulations promulgated by the Coast Guard under the authority of the Act to Prevent Pollution from Ships. 33 U.S.C. § 1908(a). The regulation under which the defendants are charged is under the general heading "Oil Pollution" and reads as follows:

§ 151.10 Control of discharge of oil.

(c) The cargo related oil residues of an oil tanker, including residues from cargo pump room bilges and all oil residues mixed with oil cargo residues shall not be discharged overboard except as provided for in Part 157 of this chapter.

33 C.F.R. § 151.10(c).

The government relies principally on the definition of "oil" given earlier in the regulations. The definition is as follows:

*Oil* means petroleum in any form including crude oil, fuel oil, sludge, oil refuse, and refined products. "Oil" does not include animal or vegetable based oil nor does it include noxious liquid substances designated under Annex II of MARPOL 73/78.

33 C.F.R. § 151.05. The government contends this definition "includes petroleum 'in any form', demonstrating that 'oil' need be neither a liquid, nor contain all components of crude oil." The regulation defines oil in terms of petroleum, a term left undefined. The government tells us we may rely on the dictionary. A standard definition of petroleum is "[a] naturally occurring complex liquid hydrocarbon which after distillation yields combustible fuels, petrochemicals and lubricants; can be gaseous (natural gas); liquid (crude oil, crude petroleum); solid (asphalt, tar, bitumen), or a combination of states."

*McGraw–Hill Dictionary of Scientific and Technical Terms* (5th ed.1994). By this definition, petroleum can exist in a solid state. It is therefore no objection that the muck is solid. That the muck can be described as "tarry" strengthens the argument for treating the muck as oil under the regulations. In the context of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) we have also noted that waxes are among the "useful products" of petroleum. *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (9th Cir.1989). To this point the government is persuasive.

Difficulty, however, is created by another case also decided under CERCLA, *Cose v. Getty Oil Co.*, 4 F.3d 700 (9th Cir.1993). There the issue was whether the bottoms of crude oil tanks were "petroleum, including crude oil or a fraction thereof" under CERCLA, 42 U.S.C. § 9601(14), and the definition of "petroleum" used was

> [A]n oily flammable bituminous liquid ... that is essentially a compound mixture of hydrocarbons of different types with small amounts of other substances (as oxygen compounds, sulfur compounds, nitrogen compounds, resinous and asphaltic components, and metallic compounds) ... and that is subjected to various refining processes (a fractional distillation, cracking, catalytic reforming, hydroforming, alkylation, polymerization) for producing useful products (as gasoline, naphtha, kerosene, fuel oils, lubricants, waxes, asphalt, coke, and chemicals....)

*Cose*, 4 F.3d at 705 (emphasis omitted) (quoting *Wilshire*, 881 F.2d at 803). Consulting the dictionary in *Cose* as in this case, we noted that crude oil tank bottoms are "never 'subjected to various refining processes' as required by our 'petroleum' definition." *Cose*, 4 F.3d at 705. We added that "such tank bottoms are not used 'for producing useful products'." *Id.* We concluded that what was at the oil tank bottoms was "simply discarded waste." *Id.*

The statute involved here is not CERCLA, and 33 C.F.R. § 151.05's definition of oil is not limited to "useful products," but we can scarcely disregard our reasoning in *Cose*.

The muck picked up by scraping is not refined petroleum; it is not a useful petroleum product; it can be regarded as simply discarded waste and not as an oil residue. The government interpretation is thus not shown to be wrong. What is established is that a different interpretation of "petroleum" and so of "oil" is equally plausible. Therefore, defendants could not fairly have been on notice that the muck they discharged would be considered "oil."

The government meets the ambiguity in the meaning of "oil" by pointing out that the term in the regulation occurs in the four word sequence that spells out CROR; that "residue" means "what is left over"; and that there is no doubt that the muck contains what is leftover from an oil cargo after the cleansing of the tanker. Muck, in other words, contains some indeterminate amount of residue or remainder of cargo-related oil.

The problem with this exegesis is that "residue" itself is ambiguous. "Residue" means what remains of a given substance, or "residue" means what remains after a given substance is removed. In the present context a CROR is either what remains of the original oil or a CROR is what is left after the original oil is cleaned out, leaving what is waste if *Cose* is followed. The government says that "but for the original oil there would not be a CROR." True, but it's not clear what the CROR comprises—a remainder of the original oil or what is left when the original oil is removed leaving a waste that is no longer oil "in any form." The ambiguity created by *Cose* is not dissolved. The same ambiguity apparently exists in the standard nomenclature of the sea. Thus, in a standard marine dictionary "residue" is defined as: "That which remains after oil is pumped out of the tanks of a tanker, or that which is left after unloading bulk cargos." Eric Sullivan, *The Marine Encyclopaedic Dictionary* (3d ed.1992). It is not clear whether "that which remains" includes oil or does not include oil.

Further complicating the interpretation of "cargo related oil residue" is § 151.10(c)'s definition of CROR as "including ... all oil residues mixed with oil cargo residues." The regulation is silent as to the distinction be-

tween an "oil residue," an "oil cargo residue," and a "cargo related oil residue." Although each term should have an independent meaning under § 151.10(c), the lack of obvious distinctions between the phrases deepens the regulation's ambiguity.

The policy of the statute—to prevent pollution of the ocean by oil without imposing too heavy a burden on oil transport by tanker—does not resolve the ambiguity. Legislative history is not enlightening. No industry usage of CROR is known. The structure of the regulations does not answer our doubts.

The statute implements MARPOL, a multinational agreement that "attempts to strike a balance between the need to protect and preserve the marine environment and the desire not to impose laws which make shipping prohibitively expensive." Andrew Griffin, *MARPOL 73/78 and Vessel Pollution: A Glass Half Full or Half Empty,* 1 Ind. J. Global Legal Stud. 489, 490 (1994). The agreement tried to take into account the conflicting interests of environmentalists and oil importers, coastal states and flag states. *Id.* at 512–13. It is unsurprisingly not a model of clarity, and yet, unenforced as it has been in the way the government now seeks to enforce it, MARPOL is estimated by the Coast Guard to have reduced oil tanker operational pollution eighty-five percent since 1973. *Id.* at 503.

We are dealing with a regulation criminalizing conduct openly engaged in by individuals with sufficient experience and seniority to be captains of their vessels. The practice of a tanker captain anchoring in some protected harbor and intensely scouring the innards of the tanks so that "black chunks of wax come off like asphalt" which "must then be scooped off the floor and disposed" is noted as common. Eric Nalder, *Tankers Full Of Trouble: The Perilous Journey of Alaskan Crude* 170 (1994). No suggestion is offered in this narrative of public facts that the disposal is considered subject to criminal sanctions. No attempt was made by the government to enjoin the captains' practice, to subject them to civil sanctions or to enforce earlier a statute that has been on the books since 1980 and under which a regulation was adopted in 1983. Our own case law provides in a differ-

ent context a definition of petroleum at odds with the regulation on which the government relies. Like the district court we have been puzzled by what the regulation means. The line to be drawn in this complex and comprehensive area of environmental protection was supposed to be drawn by an agency with expertise in the subject: it was incumbent on that agency to draw the line "in language that the common world will understand." *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 341, 75 L.Ed. 816 (1931).

In the face of uncertainty as to the meaning of what is forbidden, the rule of lenity requires dismissal of count one of the indictment. *See United States v. Granderson,* 511 U.S. 39, 54, 114 S.Ct. 1259, 1267, 127 L.Ed.2d 611 (1994); *United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971).

AFFIRMED.